UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

CAROL M. BEYER,

        Plaintiff,

        v.                              Case No. 04-C-0608

LIBERTY LIFE ASSURANCE
COMPANY OF BOSTON,
LIFE INSURANCE PLAN FOR
MODINE MANUFACTURING
COMPANY SALARIED EMPLOYEES,

        Defendants.

DECISION AND ORDER DENYING PLAINTIFF'S SECOND MOTION
FOR SUMMARY JUDGMENT

        Plaintiff, Carol Beyer (Beyer), brought suit against defendants Liberty Life Assurance Company of Boston (Liberty) and Life Insurance Plan for Modine Manufacturing Company Salaried Employees (Life Insurance Plan) alleging that the defendants terminated her waiver of life insurance premium benefit in violation of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 et seq. (1988). The defendants acted after concluding that Beyer no longer qualified as totally disabled under the Life Insurance Plan. Beyer now moves for summary judgment.

        The court has jurisdiction under 28 U.S.C. § 1132 and 28 U.S.C. § 1331. And, for the reasons set forth below, the plaintiff's motion will be denied.

BACKGROUND[1]

Beyer was employed by Modine Manufacturing Company (Modine) from August 1989 until July 1997. (Beyer Aff. ¶¶ 4, 18.) While working at Modine, Beyer was covered under the company's disability insurance policy and Life Insurance Plan. (Compl. ¶ 13; Meier Aff. Ex. I.) The disability plan provides long-term disability benefits to disabled employees, and the Life Insurance Plan provides disabled employees the benefit of having their life insurance premium payment waived.[2] Liberty is the claims administrator for Modine's disability policy and Life Insurance Plan. (Defs.' Br. in Opp. to Mot. for Summ. J. 4.)

Under the Life Insurance Plan, an employee is able to have the payment of life insurance premiums waived if that employee (1) has not reached age sixty; and (2) becomes totally disabled. (Pl.'s Br. in Supp. of Mot. for Summ. J. 4.) Total disability means the "complete inability of the employee to engage in any gainful business or occupation for wage or profit." (Meier Aff. Ex C.) A waiver of premium benefit for a totally disabled employee ends upon one of the following: (1) the total disability ceases; (2) such employee fails to give proof that the total disability continues; (3) such employee refuses to be examined by the physician chosen by the Plan; or (4) such employee reaches age 60. (Meier Aff. Ex. C.)

Under the Modine disability policy, disability is defined as the following:

"Disability" or "Disabled" means:

_____

[1] Beyer submitted findings of fact on November 16, 2004, in support of her first motion for partial summary judgment, which this court granted in part and denied in part on March 31, 2006. On December 16, 2006, Liberty responded to Beyer's November 16, 2004, findings of fact and presented its own findings of fact on that date. For the purpose of Beyer's current (second) motion for summary judgment, she relies on the findings of fact submitted November 16, 2004. On September 9, 2006, Liberty submitted a brief and new findings of fact opposing Beyer's current motion for summary judgment, to which Beyer responds.

[2] When referring to the waiver of life insurance premium benefit at issue in this case, the court uses the terms "waiver of life insurance premium benefit" and "waiver of premium benefit" interchangeably.

2

> i. If the Covered Person is eligible for the 24 Month Own Occupation Benefit, "Disability" or "Disabled" means during the Elimination Period and the next 24 months of Disability the Covered Person is unable to perform all of the material and substantial duties of his occupation on an Active Employment basis because of an Injury or Sickness; and
>
> ii. After 24 months of benefits have been paid, the Covered Person is unable to perform, with reasonable continuity, all of the material and substantial duties of his own or any other occupation for which he is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity.

(Meier Aff. Ex. I)

On March 6, 1996, Beyer underwent sinus surgery. (Beyer Aff. ¶ 5.) Following surgery, she began to suffer serious facial pain and pressure across her forehead. (*Id.* ¶¶ 8-9.) Wausau Insurance Companies, Liberty's predecessor as claims administrator, granted Beyer short-term disability benefits on March 6, 1996. (*Id.* ¶ 14.)

Beyer met with physicians regarding her sinus pain and pressure routinely following her surgery.[3] On February 20, 1997, she saw Mark Lindstrom, D.O., whose notes indicate that Beyer reported that not an hour has passed since her surgery without pain. (R. at 92-93.)[4] On May 29, 1997, Beyer was seen by Lorri Lobeck, M.D. (R. at 152.) Dr. Lobeck's consultation notes state that Beyer suffers from constant pressure in her head which becomes so painful that she must retire to bed. (*Id.*) In addition, Dr. Lobeck wrote that she

---

[3] For the purposes of this order, the court references the most relevant reports included in the record and highlighted by the parties in their summary judgment briefs and proposed findings of fact. The court notes the plaintiff's disregard for Civil L. R. 56.2 addressing the preparation of and responses to proposed findings of fact. This is demonstrated by plaintiff's referencing wrong pages in the record, (*See e.g.*, Pl.'s Proposed Findings of Fact ¶¶ 26, 27), and occasional failure to provide copies of certain supporting documents that were referenced in her proposed findings of fact, (*See, e.g.*, *Id.* ¶¶ 39, 41-45, 59, 65). Further, in its responses to the defendants' proposed findings of fact, plaintiff did not clearly delineate "only those findings to which it is asserted that a genuine issue of material fact exists," *see* Civil L. R. 56.2(c), and instead included arguments irrespective of whether the proposed fact was actually in dispute.

[4] For ease of reference, citations to the administrative record will correspond to the page number stamped on the bottom of each page.

3

was "less than optimistic that other medications are going to lead to improvement in her symptoms." (*Id.*)

The Social Security Administration determined Beyer to be fully disabled on July 18, 1997. (R. at 554.) Eleven days later, on July 29, 1997, Beyer underwent a week of tests, examinations, and pain treatments at the Mayo Clinic. (Beyer Aff. ¶ 20.) She returned to the Mayo Clinic on September 15, 1997, for more testing; the Clinic observed that Beyer may have "chronic pain syndrome" and recommended pain management. (Beyer Aff. ¶ 34; R. at 123-24.)

On March 1, 1998, Beyer forwarded her Mayo Clinic records to Wausau Insurance Companies, (R. at 584), and on June 1, 1998, she forwarded to Wausau Insurance Companies medical treatment information and a list of her prescription medications, (R. at 575). Wausau Insurance Companies granted Beyer long-term disability benefits on August 14, 1998. (R. at 506-07.)

On September 13, 1999, Beyer underwent a sleep study at the Columbia St. Mary's Sleep Disorders Center. Rose Franco, M.D., who conducted the study, observed that Beyer's "[o]verall sleep architecture is abnormal," but that there is "no evidence of significant sleep disorder breathing or paroxysmal movements of sleep." (R. at 135-36.)

On June 5, 2000, Beyer issued a release permitting Liberty to review all documents in her Social Security file. (Beyer Aff. ¶ 27.) In October 2002, Beyer provided Liberty with updated medical records. On November 8, 2000, at Liberty's request, Beyer was examined by Michael Nordstrom, M.D. Dr. Nordstrom reported as follows:

> Impression: Debilitating headache pain status post endoscopic
> sinus surgery in March of 1996. As is the case in many
> circumstances regarding chronic pain, there are no objective

4

findings to explain the severity of headache pain that she is experiencing. At this point, there are no further diagnostic tests or treatment I would recommend. She appears to be functionally impaired due to the chronic intractable pain and her inability to remain up for more than several hours. It would be reasonable, however, for a functional capacity evaluation to be performed. Based on my interaction with Mrs. Beyer, it appears at this point she is not able to perform 8 hours per day of sedentary activity on a continuous basis. At this point, I would not expect any continued improvement, as at this point this has gone on for approximately 4-1/2 years. According to the Guides to the Evaluation of Permanent Impairment, Third Edition, of the American Medical Association, establishment of the level of impairment is very difficult. Objective findings to support the diagnosis may be lacking entirely. Dysfunction associated with chronic pain can be significant resulting in patients disengaging themselves from normal work activities, as well as social activities.

(R. at 335-56).

Liberty sent a letter to Beyer on September 17, 2001, stating that "we have verified that total disability has continued without interruption. The waiver of premium benefits will continue subject to annual submission of proof of the uninterrupted continuance of disability." (Beyer Aff. ¶ 33.) On December 6 and 12, 2001, Sara Swanson, PhD., at the request of Liberty, performed a neuropsychological evaluation of Beyer. Dr. Swanson observed that Beyer "was unable to complete the testing in one day due to fatigue. Thought processes were logical, organized and goal directed. Level of effort appeared reduced as her energy was low and she took breaks during tests. . . ." (R. at 284.) Dr. Swanson also concluded that Beyer was probably not malingering. (R. at 285.)

In early 2002, Liberty's disability department retained Neil Pollack, D.O., and Robert Porter, M.D., to evaluate Beyer's condition. (Defs.' Br. 3.) Dr. Pollack examined Beyer on January 7, 2002, reviewed her records and found as follows:

> She described constant pressure-like face pain between her forehead, eyes, and sometimes under her eyes. The pain was constant and increased throughout the day. She became very tired during the day and said, "I cannot function anymore." She stated she had to rest during the day and the pain was increased by weather changes, smoke, excessive movement, and noise. She found it difficult to concentrate and was exhausted because of the pain. . . . Diagnostically, she appears to meet criteria for dysthymia and pain disorder associated with psychological factors and a general medical condition. . . . She exhibited signs of a chronic pain disorder with muscle contraction, psychological pain behavior, somatoform features, and probable masked depression. . . . Mrs. Beyer exhibited a complex condition. . . . Treatment should consist of supportive care with psychosocial understanding and medical management. I have not found chronic narcotics and additional breakthrough medicines helpful in a situation like this.

(R. at 275-77.)

Dr. Porter, who is board certified in occupational medicine, reviewed the medical notes on Beyer provided by Dr. Jacobs, Dr. Noonan, Dr. Samuel, Dr. Donatello, the Mayo Clinic, Dr. Nordstrom, Dr. Swanson, Dr. O'Malley, and Dr. Pollack. (R. at 277.) Dr. Porter's March 4, 2002, report focusing on an "Occupational Medical Assessment" of Beyer stated:

> The information taken together does not support an impairment that would prohibit Ms. Beyer from returning to full-time work duties. Ms. Beyer has had chronic pain complaints related to neuralgia. However, I agree with Dr. Moyer's opinion that there is no physical limitation on her ability to perform sedentary work duties.
> . . .
> Although Ms. Beyer has a history of chronic pain complaints and may be considered to have a chronic pain syndrome, she retains the cognitive abilities to perform work duties and the neuromuscular abilities to perform full-time work duties. She would benefit from reduction in pain medications since they will often contribute to rebound symptoms. Functional information through activities check or surveillance is often helpful in demonstrating the level of function.

6

> Taking all of the information together supports the ability of Ms. Beyer to perform work duties on a full-time basis at least in a sedentary work level.

(Defs.' Br. 4; R. at 277.) (R. at 277-78.)

On March 13, 2002, Liberty's disability department determined that Beyer could perform work duties on a full time basis at a sedentary work level. (Defs.' Br. 4.) Consequently, it notified Beyer on March 26, 2002, that it was terminating her long-term disability benefits because she no longer met the definition of having total disability. (R. at 249-52.) In the three-page letter to Beyer discussing the reports of Dr. Nordstrom, Dr. Swanson, Dr. Pollack, Dr. Porter and others, Liberty stated in part:

> The reports of doctors Pollack and Swanson, as well as all of the medical information in your claim file, have been reviewed by Dr. Robert C. Porter, an occupation medicine specialist. It is the opinion of Dr. Porter that the information, taken together, does not support an impairment that would prohibit you from returning to full-time work duties. Based on these examinations and the other medical information in your file, Dr. Porter finds that you retain the cognitive and neuromuscular ability to perform full-time work at a sedentary level.

(R. at 250) Beyer requested reconsideration of this determination, and on August 27, 2002, Liberty notified Beyer's attorney that "all medical information contained in Ms. Beyer's file is being reviewed. None of the specific evidence contained in her file will be rejected." (Meier Aff. Ex. K.)

On August 28, 2002, Liberty's disability department referred Beyer's medical file to Dr. Attfield for review of her neuropsychological evaluation and complaints of facial pain. (Meier Aff. Ex. H.) After his review of Beyer's file, Dr. Attfield noted that Beyer's functional

Case 2:04-cv-00608-CNC   Filed 01/15/08   Page 7 of 21   Document 62

capacity was probably greater than indicated by testing. (Meier Aff. Ex. F.) Dr. Attfield made the following recommendations as to Beyer:

- There is no indication of impairment due to depression.
- Functional capacity cannot accurately determined [sic] given the questionable validity of the neuropsychological evaluation [completed by Dr. Swanson]. A full, good faith effort would be required in order to accurately assess restrictions and limitations.
- Under current circumstances, I recommend that the functional capacity of the insured is probably greater than indicated on testing.
- I would recommend that symptom validity test data indicated exaggerated level of impairment.

(*Id.*)

On October 2, 2002, Liberty's disability department completed its Appeal Recommendation, which suggested maintaining the denial of Beyer's long-term disability benefits. The four-page document, which referenced the reports of Dr. Jacobs, Dr. Nordstrom, Dr. O'Malley, Dr. Swanson, Dr. Pollack, Dr. Porter, and Dr. Attfield, concluded: "Although claimant continues to report subjective complaints of facial/head pain, the medical and clinical evidence does not establish that her intractable head pain is of nature [sic] and severity which would preclude her from performing her own or other occupations." (Meier Aff. Ex. L.)

Beyer was notified in a letter of the disability department's appeal determination. (Meier Aff. Exs. J., A.) In an action separate from the pending one, Beyer filed suit against Liberty regarding the termination of her long-term disability benefits.

On November 1, 2002, Beyer issued an "Authorization to Obtain and Release Information" requesting that Liberty continue waiving her life insurance premiums based on her total disability. (Beyer Aff. ¶ 38.) The release authorized Liberty to review all of Beyer's

medical and employment records. With this request, Beyer issued a "Claimant Supplemental Statement" advising that she is involved in a lawsuit challenging the termination of her long-term disability benefits. (*Id.* ¶ 39.)

On November 25, 2002, Liberty's life insurance department sent a letter to Beyer indicating that Beyer had not provided updated medical reports as it requested on September 25, 2002, and that as a consequence her waiver of life insurance premiums claim was being closed. (Meier Aff. Ex. E.) However, on March 31, 2003, Liberty's life insurance department sent Beyer a letter stating: "Based on recently obtained medical information, we are satisfied that you have been totally disabled through the date you were last seen by your physician." (Beyer Aff. ¶ 40.) The day after Beyer received this letter, Beyer's attorney contacted Liberty's attorney to discuss a default judgment in Beyer's favor in her disability claim suit. (Olson Aff. ¶ 3.)

In April 2003, Liberty's disability department transferred information on Beyer to Liberty's life insurance department. (Defs.' Br. 6.) On May 1, 2003, the life insurance department sent Beyer a letter informing her of its decision to discontinue her waiver of premium benefit based on its conclusion that she no longer met the life insurance policy definition of "totally disabled." (Meier Aff. Ex. B.) The letter prefaced the termination by stating "we have recently received and reviewed additional medical documentation from your long-term disability file." (*Id.*) The letter continued,

> Your entire claim file was reviewed and while we recognize that you continue to complain of facial/head pain, the totality of medical and vocational documentation reviewed does not substantiate that you are disabled from performing all occupations within your vocational capacity.
> . . .

9

On October 26, 2000, you were evaluated by Dr. Nordstrom of the Otolaryngology Head and Neck Surgery Group. You were evaluated for headache pain. You informed Dr. Nordstrom that immediately following the sinus surgery and persisting to the present time, you have had chronic headache pain. Physical examination revealed essentially normal findings. Dr. Nordstrom noted, "There are no objective findings to explain the severity of headache pain that she is experiencing. At this point, there are no further diagnostic tests or treatments that I could recommend." Dr. Nordstrom comments that based on complaints of pain, "she appears to be functionally impaired due to chronic intractable pain and her inability to remain up for more than several hours." Based on his interaction with you, he states "it appears that at this point she is notable [sic] to perform 8 hours per day of sedentary activity on a continuous basis." "Dysfunction associated with chronic pain can be significant resulting in patients disengaging themselves from normal work activities, as well as social activities."

"[Our Medical Consultant] notes that you had a CT of the sinuses and aside from old surgical changes there were no other pathology noted. You were seen at the Mayo Clinic for a pain evaluation. They did not feel that you had any problem that could be treated by any further surgery. They reviewed the numerous treatments that you had undergone in the past. . . . None of these were of any benefit. You also tried numerous medications . . . with no benefit. You have undergone a sleep study due to your reports of daytime hypersomnolence. This study was entirely normal aside from findings consistent with her sleep deprivation secondary to your chronic pain. . . . Also, as it appears that you have suffered from depression and have been taking Prozac for a long period of time without any change in your dosing, it was suggested additional information was needed to clarify if your depression is contributing to your overall pain syndrom.

On January 7, 2002, you underwent an Independent Medical Examination conducted by Dr. Pollack, Neurologist. You informed Dr. Pollack that you suffer from constant pressure-like pain between your forehead, eyes, and sometimes under your eyes. . . . You claimed you were incapable of working at that time. . . . Dr. Pollack indicated it was difficult to touch your face because of her withdrawal responses. . . . Your neck motions were normal, you had no neck bruits and your heart was rhythmic. Based upon Dr. Pollack's review of your medical file along with conducting a physical examination, he notes. "My

10

examination was negative for any neurological lateralization." "Mrs. Beyer exhibited a complex condition." "There were no signs of specific neuralgia or other lateralized neurological dysfunction. She exhibited signs of a chronic pain disorder with muscle contraction, psychological pain behavior, somatoform features, and a probable masked depression."

Robert C. Porter, M.D., Board Certified Occupational Medical [sic] reviewed your file, as well as reports from Dr. Swanson, Neuropsychologist, Dr. Pollack, Neurologist, and Dr. Moyer who had completed a medical record assessment of your condition. He concludes, "The information taken together does not support an impairment that would prohibit Ms. Beyer from returning to full-time work duties. . . . I agree with Dr. Moyer's opinion that there is no physical limitation on her ability to perform sedentary work duties." . . . Dr. Porter notes, "Although Ms. Beyer has a history of chronic pain complaints and may be considered to have a chronic pain syndrome, she retains the cognitive abilities to perform work duties and the neuromuscular abilities to perform full-time work duties. Taking all of the information together supports the ability of Ms. Beyer to perform work duties on a full-time basis at least at a sedentary work level."

Although you report subjective complaints of pain, the medical and clinical evidence does not establish that your head and facial pain, is of nature and severity which would preclude you from doing your own occupation and other occupations for which you are trained.

You have undergone extensive treatment, medications and assessments, without any reports of improvement since 1996. Radiologic testing included routine radiographs, CT scans and MRI's have not shown anything that would cause these symptoms. Physical exam findings have been essentially normal. It has been noted from the Pain Clinic there is no muscular etiology, neurolytic etiology, rheumatic etiology or vascular etiology. Examinations are also negative for any neurological lateralization and no signs of specific neuralgia or other lateralized neurological dysfunction. Information from Dr. Swanson, Dr. Pollack and Dr. Moyer does not support an impairment that would prohibit you from returning to full time work duties. Medical data does not support physical limitations from you performing sedentary work duties on a full time basis.
. . .

11

> Based on this information, you no longer meet the definition of
> disability. Therefore, as of May 1, 2003, we must deny your claim
> for further benefit consideration. . . .

(*Id.*)

Beyer requested a review of this decision by Liberty pursuant to ERISA and

Liberty's review policy. On November 20, 2003, Liberty completed its Appeal

Recommendation. The Appeal Recommendation stated simply:

> Medical documentation in Ltd [Disability Department] file clearly
> substantiates Not TD [totally disabled] Any Occ [any occupation].
> Life Waiver benefits were continued beyond the denial of Ltd in
> error as the Life Claims case manager was not aware of denial.
> This was correctly denied once documentation was received.
> Recommend uphold.

(Meier Ex. M.) Liberty's sent Beyer's attorney a letter that day affirming the denial of the

waiver of premium benefits indicated in the May 1, 2003, letter. The letter stated in relevant

part:

> The denial letter of May 1, 2003 outlines the reasons for which
> Ms. Beyer's benefits were denied along with identification of what
> medical documentation was considered in the determination.
> . . .
> On March 26, 2002 Ms. Beyer was notified of the denial of Long
> Term Disability benefits, as she no longer met the definition of
> disability. This determination was appealed and Ms. Beyer's [sic]
> has since received Liberty's appeal review determination through
> an October 8, 2002 letter indicating that the original denial of
> benefits was upheld.
> . . .
> As you are aware from the previous denial letters regarding Long
> Term Disability benefits, all medical documentation was
> considered in making such a determination, including the opinions
> of Drs. Nordstrom and Jacobs. Although there has been no
> additional medical received [sic] since March 31, 2003, the denial
> of Long Term Disability benefits for the reason of being found not
> disabled Any Occupation would substantiate the closure of the
> Life Waiver of Premiums claim.

12

> This claim determination reflects an evaluation of the claim facts
> and policy provisions.

(Meier Aff. Ex. B.)

The letter further stated that Beyer's waiver of premium benefits should have stopped on March 31, 2002, for the same reasons set forth in the March 2002 letter sent by Liberty's disability department terminating Beyer's long-term disability benefits. (*Id.*) Liberty observes that the erroneous continuation of the waiver of premium benefit after March 31, 2002, occurred after the life insurance specialist failed to review Beyer's disability until April 2003. (*Id.*) Liberty added that it would not seek reimbursement of funds paid to Beyer. (*Id.*)

On June 6, 2004, Beyer filed suit pursuant to 29 U.S.C. § 1132(a)(1)(B) against Liberty and the Life Insurance Plan alleging that her waiver of life insurance premium benefit had been terminated wrongly. Beyer further claims that Liberty and the Plan failed in discharge their fiduciary duties under 29 U.S.C. §§ 1104(a)(1)(B), (a)(1)(D); failed to provide adequate notice of termination setting forth the specific reasons for denial of benefits as required by 29 U.S.C. § 1133(1); and failed to conduct a full and fair review of her claim as required by 29 U.S.C. § 1133(2). Beyer seeks compensatory damages for losses of benefits and costs and attorneys' fees. Moreover, Beyer seeks the restoration of her waiver of premium benefits.

On November 16, 2004, Beyer filed a motion for partial summary judgment. At the hearing on March 29, 2006, the court clarified that Beyer's motion sought additional discovery to supplement the administrative record. The request was denied. (Docket # 39, 40.)

## II. DISCUSSION

ERISA permits a beneficiary to sue to recover benefits due, enforce his rights, or clarify his right to future benefits under the terms of an employee welfare benefits plan. 29 U.S.C. § 1132(a)(1)(B); *Casey v. Uddeholm Corp.*, 32 F.3d 1094, 1095-96 (7th Cir. 1994). In the present case, the standard of review is two fold: a summary judgment standard as to all facts and inferences, and a de novo standard as to the administrative record.

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the initial burden of demonstrating that it is entitled to summary judgment. *Id.* at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend its case. *Id.* at 322-24.

In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). While the mere existence of some factual dispute does not defeat a summary judgment motion, there must be a *genuine* issue of *material* fact for the case to survive. *Id.* at 247-48.

"Material" means that the factual dispute is outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. A "genuine" issue of material fact requires specific and sufficient evidence that, if believed by a jury, would support a verdict in the nonmovant's favor. Fed. R. Civ. P. 56(e);

14

*Anderson*, 477 U.S. at 249. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In deciding ERISA claims, the court reviews a plan administrator's benefits decision under a de novo standard, unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility or to construe plan terms. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Where the plan documents contain ambiguous language or no language regarding the scope of judicial review, the court reviews de novo the meaning of the ERISA contract and whether the denial of benefits was correct. *Herzberger v. Std. Ins. Co.*, 205 F.3d 327, 330 (7th Cir. 2000); *Pfluger v. U.S. Group Long-Term Disability Ins. Plan*, 2007 U.S. Dist. LEXIS 3161, *31 (E.D. Wis. Jan. 16, 2007). De novo review applies to an administrator's factual findings and interpretations of the policy language. *Ramsey v. Hercules, Inc.*, 77 F.3d 199, 204 (7th Cir. 1996).

Here, the parties agree that a de novo standard applies to the court's review of the administrator's decision to terminate Beyer's waiver of life insurance premium benefit. (Pl.'s Br. 4.); (Defs.' Br. 8.); (Docket # 39). Because, as discussed above, a motion for summary judgment requires all evidence in the light most favorable to the nonmovant, the court must deny the pending summary judgment motion if, after considering all facts and reasonable inferences therefrom, a fact finder could reasonably conclude that the termination of Beyer's waiver of premium benefit was correct. In that regard, Liberty's decision to terminate Beyer's waiver of premium benefit could be considered correct if the record

15

demonstrates that a reasonable jury could find that she is able "to engage in any gainful business or occupation for wage or profit." [5]

There are three arguments to support Beyer's assertion that she is totally disabled and should continue to receive the waiver of premium benefit. She first asserts Liberty had previously declared her totally disabled and then reversed its decision without "any plausible explanation." Hence, she reasons that she should continue to be found totally disabled. In particular, Beyer takes issue with the March 31, 2003, letter in which Lori McEntire of Liberty's life insurance department wrote "[b]ased on recently obtained medical information, we are satisfied that you have been totally disabled through the date you were last seen by your physician." (Meier Aff. Ex. E.) Following receipt of this letter, Beyer's attorney contacted Liberty's attorney requesting a default judgment in Beyer's separate lawsuit over the termination of her long-term disability benefits. Beyer next heard from Liberty on May 1, 2003, when she was notified that Liberty was terminating her waiver of premium benefit.

While it is true that Liberty, as an entity, had access to all of Beyer's records and received no new medical information regarding her condition between March 31 and May 1, 2003, Liberty presents a plausible explanation for its action that creates a genuine issue of fact. It contends that its life insurance department was not aware until April 2003 that its disability department terminated Beyer's long-term disability benefits in March 2002, or the reasons for termination of her long-term disability benefits. In its May 1, 2003, letter, Liberty

_____

[5] Courts have noted tension between the standards of review to be applied in this situation. *See Wilson-Evans v. Safeco Life Insurance Co.*, N. 04c594, 2005 U.S. Dist. LEXIS 12647, *21 (W.D. Wis. June 23, 2005). For a truly de novo review in an ERISA case, "the appropriate proceedings for such fact-finding is a bench trial and not the disposition of a summary judgment motion." *Casey*, 32 F.3d at 1099.

explains that "Although your claim for waiver of premium benefits was reopened on March 31, 2003, we have recently received and reviewed additional medical documentation from your long-term disability file."  (Meier Aff. Ex. B.)

The "recently received" medical documentation, which was transferred to the life insurance department in April 2003, included the reports of Drs. Attfield, Pollack, and Porter, along with the disability department's termination of disability benefits letters.  Dr. Porter's report notes that "[t]aking all of the information [in her medical files] together supports the ability of Ms. Beyer to perform work duties on a full-time basis at least at a sedentary level."  (R. at 278.)  The letter of May 1, 2003, discussed Dr. Porter's report, as well as the earlier, and more favorable, reports of Dr. Swanson and Dr. Nordstrom, who concluded "it appears that at this point she [Beyer] is not able to perform 8 hours per day of sedentary activity on a continuous basis."  (Meier Aff. Ex. B.)  This letter makes clear that the new information was the decisive factor in Liberty's decision to reverse its previous decision that Beyer was totally disabled.  When the May 1 letter is considered along with Dr. Porter's report, Beyer's claim that she is totally disabled is shaken.

The receipt of additional medical information undermining the conclusion that Beyer was totally disabled establishes a basis for Liberty to reconsider its classification of Beyer.  While no new information as to Beyer's condition was discovered between March 31 and May 1, 2003, slow communication between Liberty's various departments does not entitle Beyer to continued benefits.

Beyer's assertion that Liberty terminated her benefits because there was no "objective" evidence explaining the severity of her pain is also an insufficient basis for granting her summary judgment.  Beyer cites to *Hawkins v. First Union Corp. Long-Term Disability*

17

*Plan*, 326 F.3d 914, 918-19 (7th Cir. 2003) and *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 442-43 (3rd Cir. 1997) to support her claim that a decision to terminate benefits based on the absence of objective evidence can violate ERISA. However, this argument is premature, because whether Liberty actually based its decision to terminate benefits on a lack of objective evidence is a disputed issue of material fact. Indeed, Liberty affirmatively denies that it ever required objective evidence of disability from Beyer, and nothing in the record disproves that claim.

Apparently, the lack of objective evidence was a factor in Liberty's decision regarding Beyer's benefits. For example, the May 1, 2003, letter notes that "Although you continue to report subjective complaints of pain, the medical and clinical evidence does not establish that your head and facial pain . . . would preclude you from doing your own occupation. . . . Physical exams are essentially normal." However, there is a distinction between Liberty basing its conclusion purely on a lack of objective evidence and Liberty basing its conclusion on medical opinions. Here, in its correspondence with Beyer, Liberty references the medical reports of multiple physicians who noted conflicting opinions as to Beyer's vocational ability. References to the multiple, conflicting opinions precludes the court from dismissing Liberty's assertions that it reviewed *all* of the evidence prior to making its decision.[6]

---

[6] Liberty repeated in its correspondence with Beyer that it reviewed her entire file. For example, in its May 1, 2003, letter to Beyer, Liberty stated "[y]our entire claim file was reviewed and while we recognize that you continue to complain of facial/head pain, the totality of medical and vocational documentation reviewed does not substantiate that you are disabled from performing all occupations within your vocational capacity." (Meier Aff. Ex. B.) In its November 20, 2003, letter to Beyer affirming its decision to terminate benefits, Liberty again notes that it considered all of her medical evidence: "Our determination of the Disability Benefit and Waiver of Premium Benefit is based on a review of the medical information contained in Ms. Beyer's file and that which was received on appeal. . . . [A]ll medical documentation was considered in making such a determination . . . ."

Beyer's final argument is that Liberty failed to explain why it disregarded evidence of her total disability. Beyer points out that Liberty did not specifically address the merits of certain comments by her physicians regarding her disability, including Dr. Swanson's note that she "appears to meet the criteria for Dysthmia and Pain Disorder" and Dr. Pollack's finding that "[s]he exhibited signs of chronic pain disorder with muscle contraction, psychological pain behavior, somatoform features, and probable masked depression." Beyer further asserts that Liberty's reliance on Dr. Porter's report is not reasonable because he only reviewed her file and did not physically examine her.

To support her argument that Liberty's actions violate ERISA, Beyer relies on *Hackett v. Xerox Corp. Long Term Disability Income Plan*. In that case, the court, applying an arbitrary and capricious standard of review to the administrator's decision, found that the defendant violated ERISA by failing to adequately explain its reliance on the opinion of one doctor while apparently rejecting evidence of the plaintiff's disability supplied by another doctor. 315 F.3d 771, 775 (7th Cir. 2003) ("There was no weighing of the evidence for and against, and there were no articulated reasons given for Xerox's rejection of the evidence that Hackett was unable to work. Conclusions without explanation do not provide the requisite reasoning and do not allow for effective review.").

*Hackett* is distinguishable from the present case for a number of reasons. Most important, in *Hackett*, the court applied a deferential standard of review to the administrator's decision. Inasmuch as the court's review was limited to the administrator's explanation (or lack thereof), a procedural violation by the administrator was enough for the court to reverse the district court's entry of summary judgment upholding the administrator's determination. In other words, because of the limited scope of review, the court needed additional

information before it could make a decision as to the merits of Hackett's claim. *See id.* at 775 ("Had Dr. Holeman referenced the previous opinions and explained his deviation from them, we could have readily reviewed this case.").[7]

Alternatively, under a de novo review, a court does not necessarily decide the matter on whether the procedures used were arbitrary and capricious; rather, it must "arrive at its own factual findings in determining whether benefits were properly denied." *Wilson-Evans*, 2005 U.S. Dist. LEXIS 12647, *21 (*citing Casey*, 32 F.3d at 1099); *see also Wilcsynski v. Kemper Nat'l, Ins. Cos*. 178 F.3d 933, 935 (7th Cir. 1999). *Contra Hackett*, 315 F.3d at 776 (noting that under the arbitrary and capricious review, "the court must not substitute its own judgment for that of the administrator"). In the present case, the court will not enter summary judgment *against* the administrator based on a procedural violation without going on to consider the entire record—a procedural violation does not lead to the conclusion that the Liberty's decision was incorrect and it does not entitle Beyer to the current and future benefits she seeks. *Cf. Hackett*, 315 F.3d at 776-77. Further, unlike the administrator in *Hackett*, Liberty's four-page letter to Beyer on May 1, 2002, discusses the findings of multiple

---

[7] In *Hackett*, the court found that termination of Hackett's benefits was the result of deficient *procedures*. Because the employee had previously been entitled to benefits, the court sought to restore the status quo prior to the procedurally defective termination of benefits. Therefore, it remanded the case to the district court and ordered retroactive reinstatement of Hackett's benefits. However, as the court observed, the administrator is free to initiate a new review of Hackett's eligibility for benefits.

> Indeed, nothing in this opinion should be read as expressing an opinion that Hackett's benefits should not be terminated in the future. We only address the procedures necessary for such a termination to accord with statutory requirement. Had Dr. Holeman explained his reasons for disagreeing with Dr. Gerber, this appeal might likely have been unnecessary and the termination might very well have passed the arbitrary and capricious test.

*Hackett*, 315 F.3d at 777. As such, the administrator was free to use the same information to terminate Hackett's future benefits—albeit with a more adequate explanation.

20

physicians, indicating that, at a minimum, Liberty considered evidence of Beyer's continued disability.

In addition, while it is true that Liberty based its decision, at least in part, on the medical opinion of Dr. Porter, Beyer merely asserts that the opinion is unpersuasive and should not be relied upon. This argument misses the mark, as the court will not weigh evidence at the summary judgment stage.

The evidence in the record, and the arguments presented by the parties, raise material issues of fact, particularly regarding Beyer's ability to perform "any business or occupation for wage or profit" pursuant to the Life Insurance Plan. As such, plaintiff's motion for summary judgment is denied. Therefore,

IT IS ORDERED that the plaintiff's motion for summary judgment is denied.

Dated at Milwaukee, Wisconsin, this 15th day of January, 2008.

BY THE COURT

s/ C. N. CLEVERT, JR.
C. N. CLEVERT, JR.
U. S. DISTRICT JUDGE